*1499*

JUDGE LEISURE

08 CV 5997

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

RAVENNAVI SpA,

                      Plaintiff,

    - against -

PROJECTOR S.A.,

                      Defendant.

08 CV _____

LECOPY E

JUL 01 2008

U.S.D.C. S.D. N.Y.
CASHIERS

--------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, RAVENNAVI SpA, (hereafter referred to as "RAVENNAVI" or "Plaintiff"),
by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint
against the Defendant, PROJECTOR S.A. (hereinafter referred to as "PROJECTOR" or
"Defendant") alleges, upon information and belief, as follows:

    1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the
Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the
breach of a maritime contract of charter. This matter also arises under the Court's federal
question jurisdiction within the meaning of 28 United States § 1331 and the New York
Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et
seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

    2.     At all times material to this action, Plaintiff was, and still is, a foreign corporation,
or other business entity, organized under, and existing by virtue of foreign law and was at all
material times the disponent owner of the motor vessel "PORT RUSSEL" (hereinafter the
"Vessel").

3.      Upon information and belief, Defendant PROJECTOR was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law with a place of business located at 35A, Regent Street, Belize City, Belize.

4.      By a charter party dated July 11, 2007 Plaintiff voyage chartered the Vessel to Defendant. The charter party called for a single voyage from North Europe to Ecuador for the carriage of up to a full cargo of unleaded gasoline.

5.      On the following day the Defendant wrongfully, and in repudiatory breach of the charter party, cancelled the charter party.

6.      On July 13, 2007 Plaintiff re-fixed the vessel for a substitute voyage for a single voyage from Rotterdam to New York in order to seek to mitigate the loss and damage caused by Defendant's breach of contract.

7.      Due solely to the Defendant's breach of contract the Plaintiff has sustained loss and damage. The Plaintiff had expected to earn the time charter equivalent of $22,448 per day for a voyage estimated to last 39.46 days under the fixture with Projector.

8.      The Plaintiff actually earned the time charter equivalent of $19,236.52 for a voyage that lasted 46.6542 under the substitute fixture.

9.      Thus, Plaintiff suffered loss and damage of $3,211.48 per day of the 39.46 estimated voyage days under contract with Projector for a total principal loss of $126,725.

10.     As a result of PROJECTOR's breach of the charter party as aforesaid, Plaintiff has sustained damages in the total principal amount of $126,725, exclusive of interest, arbitration costs and attorneys fees.

11.     Pursuant to the charter party, disputes exceeding $50,000 are subject to the jurisdiction of the English High Court and are to be construed in accordance with English law.

2

RAVENNAVI has commenced proceedings against PROJECTOR in the English High Court to which PROJECTOR has filed its Defence and RAVENNAVI has, in turn, filed a Reply. *See English High Court filings attached hereto as Exhibit 1.*

12.   This action is brought in order to obtain jurisdiction over PROJECTOR and also to obtain security for RAVENNAVI's claims and in aid of English High Court proceedings.

13.   Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| A. | Principal claims: | $126,725.00; |
|---|---|---|
| B. | Estimated interest on claims-<br>2 years at 6% compounded quarterly: | $ 16,053.07; and |
| C. | Estimated attorneys' fees and expenses: | $ 35,000.00. |
| **Total:** | | **$177,778.07.** |

14.   The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure[1], but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

15.   The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the

---

[1] *See* Affidavit of Kevin J. Lennon annexed hereto as Exhibit 1.

3

Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

     **WHEREFORE**, Plaintiff prays:

     A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

     B.     That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$177,778.07** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

     C.     That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

     D.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.    That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

F.    That in the alternative this Court enter judgment against the Defendant on the claims set forth herein;

G.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

H.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated:    New York, NY
          July 1, 2008

                                        The Plaintiff,
                                        RAVENNAVI SpA

                                        By: _____

                                        Kevin J. Lennon
                                        Anne C. LeVasseur

                                        LENNON, MURPHY & LENNON, LLC
                                        420 Lexington Avenue, Suite 300
                                        New York, NY 10170
                                        (212) 490-6050 - phone
                                        (212) 490-6070 - facsimile
                                        kjl@lenmur.com
                                        acl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York )
                  )  ss.:  City of New York
County of New York )

1.  My name is Kevin J. Lennon.

2.  I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.  I am an associate in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

4.  I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.  The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.  The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.  I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    New York, NY
          July 1, 2008

_____
Kevin J. Lennon

6

# EXHIBIT 1

An application to amend the Claim Form
and Substitute Projector SA for Projector
Services Limited was filed on 15.02.2008

## IN THE HIGH COURT OF JUSTICE

**Claim No. 2008 Folio 21**

## QUEEN'S BENCH DIVISION

## COMMERCIAL COURT

**BETWEEN:**

### RAVENNAVI SpA

**Claimant**

- and -

### PROJECTOR SA

**Defendant**

---

### PARTICULARS OF CLAIM

---

1. By a voyage charterparty on an amended ASBATANKVOY form dated 11th July 2007 ("the Charterparty"), the Claimants, as Disponent Owners, agreed to charter the "PORT RUSSELL" ("the vessel") to the Defendants, as Charterers, for the carriage of a cargo of unleaded gas oil from 1 to 2 safe ports ARA-Hamburg range to 1 to 2 safe ports/ stations Ecuador.

2. The Charterparty, to which the Claimant will refer for its full terms and effect, provided (*inter alia*) as follows:

   "... (C) LAYDAYS COMMENCING: 17th JULY 2007 0001 HRS
   CANCELLING: 20th JULY 2007 2359 HRS

   (D) LOAD PORT(S)/ RANGE: ½ SP ARA_HAMBURG RGE
   (E) DISCH PORT(S)/ RANGE: 1/2 SP/STS LOCATIONS ECADOR

   (F) CARGO DESCRIPTION: CHOPT UP TO FULL CARGO NDFCA PMQS
   GRADE: GASOIL UNLEADED, UNDARKER THAN 2.5 NPA,
   SEGREGATION: MAX 2 GRADES WITHIN VESSEL'S NATURAL SEGREGATION
   ...

4990044-1

(G) FREIGHT RATE(S): USD 1,435,000 BASIS 1:1 IF LOAD ARA
USD 1,475,000 BASIS 1:1 IF LOAD NTH OF ARA

ABOVE RATES ARE BASIS 1:1 AND VIA PANAMA CANAL ALL INCLUSIVE

...

(I) LAYTIME: 84 HRS SHINC
(J) DEMURRAGE: USD 26,000 PDPR
(K) COMMISION(S): 2.5 PCNT NAVIG8 EUROPE LTD

...

17. PANAMA CANAL TRANSIT CLAUSE
Any waiting time for transiting panama canal in laden condition in excess of 24 hours to
count as laytime or demurrage if on demurrage, but charterers always to have the benefit of
agreed laytime.
Prebooking, if required, to be for charterers' account.

...

39. SPEED CLAUSE
The vessel shall perform the laden passage at about 13.5 knots weather and safe navigation
permitting.
..."

3. On or about 12th July 2007 the Defendant, wrongfully and in repudiatory breach of the
Charterparty, cancelled the Charterparty.

4. On or about 13th July 2007, in compliance with their obligation to mitigate the damage
the Claimant secured an alternative fixture for a single voyage from Rotterdam to New
York ("the Alternative Fixture").

5. By reason of the aforesaid the Claimant has suffered loss and damage as particularised
below at paragraphs 6 to 8.

6. The time charter equivalent of the Alternative Fixture was US$ 19, 236.52 per day and
the voyage lasted 46.6542 days as set out in detail in the attached schedule at HPW 1.

7. The time charter equivalent of the cancelled Charterparty was US$ 22,448 per day with
a voyage estimate of 39.46 days.

4990044-1

8. In the premises the Claimant's have suffered loss and damage in the sum of US$3,211.48 per day for the 39.46 days the voyage under the cancelled Charterparty would have lasted, namely US$ 126, 725.

9. On 22ʳᵈ August 2007 the Claimant presented their claim for US$ 126,725 to the Defendant.

10. Further the Claimant claims and is entitled to interest pursuant to section 35A of the Supreme Court Act 1981 on the damages found to be due at such rate and for such period as the Court shall think fit.

AND the Claimant claims:

(1) USS 126,725, alternatively damages.

(2) Interest.

(3) Costs.

Ruth Hosking

**Statement of Truth**

The claimant believes that the facts in these Particulars of Claim are true. I am duly authorised by the Claimant to sign these statements.

Full Name:                          MARIA BORG BARTHET
Name of Claimant's solicitors:      HOLMAN FENWICK & WILLAN
Signed:                             Position or office held: Assistant Solicitor

Served this 25 February 2008 by Holman Fenwick & Willan, Marlow House, Lloyds Avenue, London, EC3N 3AL, Solicitors for the Claimants. (Ref. JJC/451/MBB-5537/4)

Attached: Charterparty between Ravennavi SpA and Projector SA dated 11 July 2007.

4990044-1

# VESSEL — PORT RUSSE

## TIME TABLE

| VOYAGE NO./ TIME CHARTER NO. | | 6 | | | MIN QUANTITY [mt] | MIN 32250 | | 10.00 |
|---|---|---|---|---|---|---|---|---|
| CHRTS / CP | | TRAFIGURA/CP DATED 13.07.2007 | | | FLAT    (USD/pmt) | | 270.00 | |
| LOAD PORTS | | ROTTERDAM | | | WS RATE    (USD) | | | |
| DISPORTS | | NEW YORK | | | LUMPSUM | | | |
| CARGO GRADES | | UNLOD GASOLINE | | | DEMURRAGE | | USD 25,000.00 | |
| QUANTITY LOADED/ BL DATE | | 32402,519/BL DATED 28/7/2007 | | | AGENCIES | | | |

| | ONHIRE | OFFHIRE | Duration | | |
|---|---|---|---|---|---|
| | | | VOY | | |
| from | 11/7/07 10.10 | | 0/1/00 0.00 | G.M.T | |
| to | 17/8/07 2.00 | | 0/1/00 0.00 | G.M.T | |
| days | 48.65417 | | 0.00000 | G.M.T. | 46.6542 |

## OFF HIRE PERIOD

| | Preliminary (U.S.D.) | Final (U.S.D.) |
|---|---|---|
| 1ª Period / Days | | |
| 2ª Period / Days | | |
| 3ª Period / Days | | |

## VOY TABLE

| | | Preliminary (U.S.D.) | Final (U.S.D.) |
|---|---|---|---|
| INCOME | | | |
| 1 FREIGHT | | 932,331.44 | |
| 2 DEMURRAGE | | 401,927.00 | |
| 3 AWAITING INSTRUCTIONS | | | |
| 4 DEVIATION (a) | | | |
| 5 DEVIATION (b) | | | |
| 6 EXTRA BUNKER CONSUMED IN DEVIATION (a) | | | |
| 7 EXTRA BUNKER CONSUMED IN DEVIATION (b) | | | |
| 8 HEAT UP CARGO TEMPERATURE | | | |
| 9 TOTAL | | | |
| EXPENSES ( Agency(b) I Bunkers I Comm(a)(b)(c) ) | | | |
| 10 PORT EXPENSES LOADPORT (1) | | 60,000.00 | |
| 11 PORT EXPENSES LOADPORT (2) | | | |
| 12 PORT EXPENSES LOADPORT (3) | | | |
| 13 PORT EXPENSES DISPORT (1) | | 35,000.00 | |
| 14 PORT EXPENSES DISPORT (2) | | | |
| 15 PORT EXPENSES DISPORT (3) | | | |
| 16 CANAL TRANSIT (1) | | | |
| 17 CANAL TRANSIT (2) | | | |
| 18 PORT EXPENSES FOR BUNKER PURPOSE | | | |
| 19 COST OF BUNKER CONSUM/USD/USD ( F.O.) | | 284,541.53 | |
| 20 COST OF BUNKER CONSUM/USD/USD ( G.O.) | | 7,218.85 | |
| 21 BROKERS COMMISSION(1+2+3+4+5) | 3.75% | 50,034.89 | |
| 22 TOTAL | | 897,463.04 | |
| 23 TOTAL NET INCOME | | 48.65417 | |
| 24 VG DAYS | | | |
| 26 DAILY PROFIT | | | |

## VOYAGE DETAILS TABLE

| AGENCY LOADPORTS | BULK MARITIME |
|---|---|
| AGENCY DISPORTS | GULF |
| COMMISSIONS | 3.75% = 1.25%ADDRESS+1.25% PETRUAN+1.25%NAVIG8 |

1ª BUNKER (Place I WW.) RUAM/PENINSULA MT 900,416 AT $ 902  FUEL OIL MT 78,905 AT $ 1,633 GASOIL

2ª BUNKER (Place I WW.)

3ª BUNKER (Place I WW.)

notes

## FUELS TABLE

| FUEL OIL | Q.TY Supplied | R.O.B. | CONS. | UNIT COST | TOTAL COST |
|---|---|---|---|---|---|
| | mt | mt | mt | usd/pmt | usd |
| R.O.B. SSP LAST VG | 545,300 | | 540,500 | 333,733 | 150,316.94 |
| 1ª BUNKER | 900,416 | 812,502 | 787,918 | 362,000 | 104,226.53 |
| 2ª BUNKER | | | | | |
| 3ª BUNKER | | | | | |
| TOTAL BUNKER SUPPLIED | 1,445,716 | | | | |
| R.O.B. SSP ACTUAL VG | 612,500 | | | | |
| BUNKER CONSUMED | | | 528,216 | | |
| COST BUNKER CONSUMED/USD | | | | | 284,541.53 |
| AV. UNIT COST BUNKER CONSUMED/USD | | | | 345,560 | |
| UNIT COST BUNKER FOR NEXT VG | | | | 362,000 | |

| GASOIL | Q.TY Supplied | R.O.B. | CONS. | UNIT COST | TOTAL COST |
|---|---|---|---|---|---|
| | mt | mt | mt | usd/pmt | usd |
| R.O.B. SSP LAST VG | 33,702 | 18,465 | 12,235 | 590,000 | 7,218.65 |
| 1ª BUNKER | 39,995 | 39,995 | | 433,000 | |
| 2ª BUNKER | | | | | |
| 3ª BUNKER | | | | | |
| TOTAL BUNKER SUPPLIED | 70,895 | | | | |
| R.O.R. ACTUAL VG | 56,400 | | | | |
| BUNKER CONSUMED | | | 12,235 | | |
| COST BUNKER CONSUMED/USD | | | | 590,000 | 7,218.65 |
| AV. UNIT COST BUNKER CONSUMED | | | | 815,418 | |
| UNIT COST BUNKER FOR NEXT VG | | | | | |

TYPE OF CONTRACT — BP VOY 3

| ADD. CLAUSES | |
|---|---|
| QUESTIONNAIRE | |
| WAITING DOCS | 3 HRS |
| BROKERS | NAVIG8 |

HSW

Ben Atkinson

From:           ravennavi@albaclick.com
Sent:           16 October 2007 07:55
To:             d.perfetto@bseag.it
Subject:        port russel projector fixture recap

<<<MSGNo:  17562-0001>>>

PLEASED TO CONFIRM FOLLOWING AGREED WITH YOUR AUTHORITY

STRICTLY PRIVATE AND CONFIDENTIAL AND NOT TO BE REPORTED
---------------------------------------------------------------------------
-------------------------

            CHARTER PARTY

            +++++++++++++++

T/C / DISPONENT OWNERS: RAVENAVVI SPA

HEAD OWNERS: Port Russel Gmbh&Co.KG, Pickhuben 2, D-20457, Hamburg,
Germany

CHARTERERS: PROJECTOR SA OR NOMINEE

BROKER 1: NAVIG8 EUROPE LTD

MAX CURTIS
TEL +44 207 659 9540 (OFFICE)
TEL: + 44 7850 202460 (MOBILE)
EMAIL: MAX@NAVIG8GROUP..COM <mailto:MAX@NAVIG8GROUP.COM>

OPERATIONS:
DEBASHISH BHATTACHARYA:
TEL: +44 207 659 9513 (OFFICE)
TEL: +44 7766 078181 (MOBILE)  : TEL: +44 208 661 7009 (AOH)
EMAIL: OPS@NAVIG8GROUP.COM

BROKER 2: NOT APPLICABLE

(DETAILS INCL BROKER/OPERATIONS CONTACTS)

CHARTER-PARTY FORM:  ASBATANKVOY
CHARTER-PARTY DATE :  11TH JULY 2007
PART I

1

(A)
```
VESSEL      : PORT RUSSEL
EX-NAME     : MERIOM JOY
SDWT        : 37,808 Metric Tonnes
SDRAFT      : 12.315 Metres
LOA         : 179.36 Metres
BEAM        : 29.028 Metres
FLAG        : MARSHALL ISLAND
BUILT       : 2002
CLASS       : ABS
STOPPERS    : 1 x 200 Metric Tonnes - Tongue Type
CHAIN SIZE  : 76 Millimetres
CUBIC 98 PCT : 44,479 Cu. Metres
SLOP 98 PCT :    208 Cu. Metres
SEGREGATIONS : 5
PUMPS       : 10 x 600 / 2 x 300 Cu. Metres/Hour
TPC         : 48.75 Metric Tonnes
BCM         : 90.68 Metres
KTM         : 45.80 Metres
`GS         : Yes
COW         : Yes
SBT/CBT     : SBT
VRS         : Yes
GRT         : 24910 Metric Tonnes
NRT         : 10657 Metric Tonnes
PCNT        : 20900 Metric Tonnes
SCNT        : 21926.96 Metric Tonnes
DERRICK/CRANE: Cranes: 1 x 10 Tonnes
COATED      : EPOXY
HULL        : Double Hull
IMO         : 9223265
CALL SIGN : V7FY2
P AND I   : GARD
TVEL EXPIRY: 05/08/2008
Nationality of Master: ROMANIAN
Nationality of Officers: ROMANIAN+ russian
 ationality of Crew: ROMANIANS
```

VESSEL LADEN SPEED: ABT 13.5 knts WSNP

IS VSL EX LAY UP: NO
IS VSL EX DRYDOCK: NO
LAST 3 CARGOES:
A) LAST : GASOIL
B) SECOND LAST: GASOIL
C) THIRD LAST: UNL MOGAS

MAJOR APPROVALS/EXPIRY: TBOOK WOG VESSEL IS NOT UNAPPROVED TO:
EXXONMOBIL / BP / SHELL / TOTAL / SUNOCO / ERG
LAST SIRE INSPECTION: (WHO/WHEN/WHERE) - SHELL 20/05/2007 - AMSTERDAM
Has vessel been involved in any collision, grounding or
pollution incident the past 12 months: NO
VESSEL POSITION AND ITINERARY

+±—+++++++++·++·+±~·++++·+·±+++±+·+++·+·++++++++++++·+++±—+++·+++·+·+·+·+++·+·+·+·+·+·++·+·+

(B) PRESENT POSITION/ITINERARY:

IN BALLAST EX WEST FARICA - ETA AMSTERDAM 17 TH JULY 2007


             DATES

+·+++·+·+±+·+·+·+·+·+++++·+·±++++·+·++++++·+·+·+++·++·++·+++++·+·+·++·+·+++++++++·+·+·+·++·±·+++++·+++++

(C) LAYDAYS COMMENCING : 17TH JULY 2007 0001 HRS
             ·CANCELLING  : 20TH JULY 2007 2359 HRS


             GEOGRAPHICAL

+·+++·+·+++·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·++·+·++·+·+·+·+·+++·+·+·+·+·++·++·+·+++·+·+·+·+++++·+·+·=

(D) LOAD PORT(S)/RANGE:  1/2 SP ARA-HAMBURG RGE

(E) DISCH PORT(S)/RANGE: 1/2 SP/STS LOCATIONS ECUADOR
\
  ·


             CARGO DESCRIPTION

+++++·+++·+·+++++++++·+·+++·++·+·+·+·+·+++·++·+·+·+·+·+·+·+++++++·+·+·+++·+++++·+·+·+++·+·+·+·+·+

(F) CARGO DESCRIPTION: CHOPT UP TO FULL CARGO NDFCA PMQS

GRADE:       GASOIL UNLEADED, UNDARKER THAN 2.5 NPA,


SEGREGATION : MAX 2 GRADES WITHIN VESSEL'S  NATURAL SEGREGAGATION

HEAT         : NOT APPLICABLE

             FINANCIAL

·+·+++·+·+++·+·+·+·+·+·+·+·+++·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·+·++·+·+++·+·+·+·+·+++·+·+·+++·+·+++·+


(G) FREIGHT RATE(S): USD 1,435,000 BASIS 1:1 IF LOAD ARA   ·
   USD 1,475,000 BASIS 1:1 IF LOAD
NTH OF ARA

ABOVE RATES ARE BASIS 1:1 AND VIA PANAMA CANAL ALL INCLUSIVE

ADDITIONAL PORTS TO BE CALCULATED AS PER OWNERS ADDITIONAL CLAUSE 12

(I) LAYTIME: 84 HRS SHINC
(J) DEMURRAGE: USD 26,000 PDPR
(K) COMMISSION(S): 2.5 PCNT NAVIG8 EUROPE LTD
(L) SPECIAL PROVISIONS:

1) OWNER CONTACT INFORMATION
OWNER/OPERATOR -  ABHAY CHARAN
OFFICE TELEPHONE NUMBER -  + 65 6622 0088

OFFICE FAX NUMBER - + 65 6622 0099
E-MAIL - OPS@NAVIG8GROUP.COM
MOBILE NUMBER - + 65 9833 5882


SECONDARY 24 HR CONTACT WITH MANAGERS

OFFICE PHONE NUMBER - +44 207 659 9553

MOBILE NUMBER - + 44 7717 882323

FOR USA CALLS:
QUALIFIED INDIVIDUAL - O'BREIN'S OIL POLLUTION SERVICE (OOPS), INC
645 CODIFIER STREET,SLIDELL
LOUSIANA 70458-4094,
USA


Oil Spill Response Organization (OSRO):
O'BREIN'S OIL POLLUTION
SERVICE (OOPS), INC
645 CODIFIER STREET,SLIDELL
LOUSIANA 70458-4094,
USA

2) CHARTERERS CONTACT INFORMATION
OPERATION CONTACTS:
OFFICE TELEPHONE NUMBER - + 41 22 909 2828
OFFICE FAX NUMBER - + 41 22 909 2820
E-MAIL: OPSDESK@PROJECTORSERVICES.CO.UK
TELEX:   412012 PROCH


OPERATOR: CAROLINE GANZ

FFICE TELEPHONE - + 41 22 909 2827

E-MAIL: OPSDESK@PROJECTORSERVICES.CO.UK

MOBILE NUMBER - + 4179 634 8957

HOME NUMBER - + 4122 301 2439


SECONDARY 24 HR CONTACT: EDITH KERTZ

OFFICE PHONE NUMBER - + 4122 909 2829

MOBILE NUMBER - + 4179 395 1776

M) ADDITIONAL CLAUSES:
1.   WSTC
2.   Y/A Rules 1974 as amended 1994

4

3.  TAXES/DUES:

Any taxes and/or dues on Freight and/or cargo to be for charterers
A/C and settled

directly by them. (No time bar to apply with respect to any
claims received by

owners for Taxes and/or Dues on Freight and/or cargo)

4.  ANCHORAGE DUES:

S. Korean anchorage dues max 48 hours to be for owner's acct
thereafter charts

acct.

5.  CARGO DOCUMENTATION:

In case vessel waited for charterers purpose including cargo
documentation after

hoses off, waiting time for such purpose to be counted as used laytime
or

demurrage if vessel on demurrage. However, charterers have the benefit
up to

, ax three (3) hours.

6.  ICE CLAUSE:

Vessel never to trade in any kind of ice including slush, nor
follow icebreaker.

7.  US COAST GUARD CLAUSE:

If the charterers order the vessel to proceed to any port(s) in the
United States, where the US coastguard or any other authority(ies) in
the US have issued any pre-arrival requirements and/or restrictions,
which will prohibit the vessel from tendering a valid notice of
adiness on arrival at the place vessel is instructed or order by the
said authorities/coastguard, then not withstanding any terms and
conditions to this charter party, the vessel will be permitted to tender
a valid notice of readiness on arrival at the place where the vessel was
instructed/ordered to await any pre-arrival clearance/instruction and
that laytime  or time on demurrage will commence after the expiration of
6 hours. Any delay after the vessel passed the pre-arrival clearance
and until the vessel arrives at the customary anchorage or berth will
not be given any reduction due to awaiting daylight, pilots, tugs, tides
or weather.

8.  CANADIAN CARGO FEE CLAUSE:

Charterers to be liable for any bulk oil cargo fees that may be imposed
by an appropriate authority with respect to vessel calling a Canadian
port which is considered to be non-member facility under the terms of
the Canadian oil pollution requirements as stated in the Canadian

shipping act.

## 9.   WAR RISK CLAUSES:

Any additional war risk insurance premiums (excluding owners basic annual war cover) in force at the date of this charter party shall be for charterers account.

Any increase in war risk insurance over and above that in force at date of charter party including insurance in respect of blocking and trapping and crew war bonus shall be for charterers account.

## 10.   ROYAL PORTBURY DOCK / AVONMOUTH:

Max 45,000 usd total portcost for owners account if vessel discharges royal portburry dock, ships due as levied on cargo discharged (ie usd ..24 pmt) to be for charterers account and settled directly by charterers.

## 11.   LIGHTERING/STS TRANSFER CLAUSE:

If lighting /STS transfer operation is required same always to be in accordance with ocimf latest edition of STS transfer. Charterers to supply all fenders/lines/hoses and any other equipment required for such an operation at charterers time and expenses and always subject to masters approval. Time to count in full 6 hrs after tendering nor or when first lighter vessel is alongside, whichever earlier, until last line/fender is off and lighter vessel has sailed. Time lost due to and/or weather and/or sea conditions to count in full as laytime or demurrage if on demurrage. If the vessel is required to complete cargo operation at a berth in port charterers will not have the benefit of 6 hours nor prior berthing in port. Charterers warrant that there is no prohibition or restriction on STS operation at the port/place to which the vessel is ordered to perform STS transfer and further that they have obtained any/all necessary local approvals or licences to carry out operations at the designated prot/place.

## · 12.   INTERIM PORT CLAUSE: (If Lumpsum)

Charterers to pay for additional interim load/disch port at cost as foll:

## A. DEVIATION:

6

Actual additional steaming time incurred as per masters statement for
deviation which exceeds direct passage from first loadport to final
dischport as per BP's distance table at CP speed At 13.5.Knots

B. PORT TIME:
Time to count in full from arrival pilot station interim load/discharge
port until dropping last outward pilot interim load/disch port.

ie no allowance for notice time, nor deduction for shifting even from
anchorage to first berth and no deduction for time lost due tide, sea
and weather conditions.

C. COST:

Deviation and port time used to be calculated at demurrage rate per day
pro rata plus cost for all bunkers consumed during the deviation as well
as bunkers in port as per master's telex/e mail statement.

Port costs to be settled directly by charterers .

D. PAYMENT:

Deviation and time used in port and bunkers consumed to be paid together
with freight immediately upon completion of discharge as per owners
telexed/e mail invoice with supporting document, which later to be
supported by hard copy documentation.

13. WEST AFRICA CLAUSES:

Max portcosts for owners account in wafrica is usd 15,000 balance
charterer's account.

Any taxes and/or dues on cargo and/or freight including but not limited
to Nigerian conservancy dues, handling charges, ship dues and NMA levy
to be for charterers account and settled directly by them.

If any vetting arrangments for same at their time and expense. Should
any delays be incurred same to be for charterers account.

7

Any time awaiting naval clearance to be for charterers account and count
as laytime or demurrage if on demurrage. Watchman if required to be
charterers account.

Any delay in obtaining Nigerian task force permission to enter Nigerian
waters to count in full used laytime or demurrage if on demurrage. NMA
fee if imposed not to be for owner's acct. The charterers are to be
responsible for the NMA approvals.

Any delays in West Africa whether berthing, shifting, discharging or
sailing due to strikes/locks/restraints/work to rule or go slow to count
in full as laytime or demurrage if on demurrage and expenses so incurred
if any to be for charterers Account.

In any West Africa port dues and/or commission on cargo and/or freight
and/or vessel to be for Charterers account provided not covered by
Worldscale and to be paid directly by them. Charterers to re-imburse
Owners immediately upon receipt of copy of Owners bank payment
instructions with agent's payment request.

All bunkers consumed for drifting to safe areas and returning to fairway
to be for charterers account and to be paid together with any undisputed
demurrage (if any) or demurrage.. This to be supported by masters
statement.

undisputed demurrage incurred in West Africa to be paid every 10 days on
account.

Extra War Risk insurance, if any, including crew war bonuses to be for
charterers account.

14. CANCELLATION CLAUSE:

If it becomes apparent that the vessel will not arrive at the load port
prior to cancelling date, charterers have the option within twenty-four
hours (24) after receipt of such notice from owners either to maintain
the charter or cancel it without penalty to either party. If charterers
do not cancel the charter within prescribed time after receipt of owners
notice, the charter party in maintained on the basis of the new
cancelling date proposed by the owners.

8

## 15. VENEZUELAN STRIKE CLAUSE

If general strike in Venezuela laytime to count in full upon tendering nor and to pay the full demurrage if on demurrage. Nor in Venezuela to be considered valid upon vessel arrival and tendering at the nominated discharge port or as reasonably near as the vessel can safely proceed to.

## 16. WEATHER PORT CLAUSE

If load/discharge in Portugal, North Spain, Morocco, Falconara, Ravenna, Fiumicino, Gaeta, Civitavecchia, Gela, Ancona, La Nouvelle, Algeria,Canary Island, Castellon, Sete, Lebanon, East Coast Mexico and/or if lightening/lightering/transhipment takes place at any location nd/or if vessel load/discharge via sea line and/or terminals not protected by breakwater any weather delays to count in full as used laytime or demurrage time if vessel on demurrage and any expenses/time for unberthing/reberthing due to bad weather to be for charterers account in all other cases/ports conoco weather clauses to apply.

## 17. PANAMA CANAL TRANSIT CLAUSE

Any waiting time for transiting panama canal in laden condition in excess of 24 hours to count as laytime or demurrage if on demurrage, but charterers always to have the benefit of agreed laytime.

Prebooking, if required, to be for charterers' account.

## 18. MISSISSIPPI RIVER PORT CLAUSE:

If vessel load/discharge at Mississippi River ports time to count in full 6 hours after (unless vessel all fast earlier) tendering NOR at ocean pilot station inbound until dropping/passing last ocean pilot station outbound, ie no deduction for time lost due to shift from anchorage to first berth, time lost due to weather and/or sea conditions and awaiting tide.

Max Usd 25,000 port costs in Mississippi for owners account thereafter for charterers.

## 19. DYE CLAUSE

Charterers have the option to add 'liquid dye' to cargo in vessels tanks. Just prior to the commencement of discharge at their risk and

9

expense.

The time and cost for the dye addition shall be for charterers account and paid together with freight..

The dye can only be added with total compliance under the full instruction and supervision of Master and/or Chief Officer who will always have final authority to how the dye is added.

Charterers to indemnify owners as per owners P & I club wording for adding dye.

Owners standard instructions for adding dye to cargo which charterers to comply in full:

1)    All dye must only be added under direct supervision of the Master/Chief

   officer

2) Dye shall only be liquid dye

   Dye to be added just prior discharge

Method of dyeing will be

Depressurize cargo tanks (pls take full precautions for HC and toxic gases during depressurization also inform terminal)

Insert a flexible pipe through a small opening or in case where vessels' has a sounding pipe same could be used.

Add dye through a funnel to the bottom of the tank, never from the top

of the tank.

## 20. TURKISH STRAITS CLAUSE

Notwithstanding anything to the contrary elsewhere herein contained if
the vessel commences the ballast voyage (as per itinerary advised Above)
in time to arrive at the loadport within the cancelling date but is
delayed because of the traffic regulations or navigational difficulties
(incl.bad weather, fog etc.) Through the turkish straits north-bound
such that vessel may not arrive by the cancelling date charterers'
option to cancel as provided elsewhere herein cannot be exercised
provided the ship arrives at canakkale by latest ..... Hrs , however if
it is apparent that vsl will miss cancelling at canakkale but can make
loadport cancelling according to estimates of turkish straits delays as
advised by turkish authorities then fixture will remain in full force.
Owners to notify charterers of the date and time that they expect the
vessel to be ready to load based on the advisory position given by the
·affic control. Notwithstanding anything to the contrary elsewhere
..erein contained, if the vessel should be delayed during tanker passage
or otherwise as a consequence of direct or indirect action of the
turkish authorities and/or observing traffic regulations and/or
navigational difficulties (incl.bad weather and/or adverse climate
conditions) through the turkish straits north-bound and south- bound in
excess of 24 hrs in total, the charterers shall pay compensation for
such delay at the rate provided for demurrage. Any additional expenses
in connection with complying with traffic regulations and/or charterers'
voyage orders as regards the passage of the turkish straits to be for
charterers' account (including but not limited to additional tugs,
pilots, additional bunkers consumed - waiting or adrift etc.)
Compensation for such delay, reimbursement for cost of bunkers and
additional expenses to be paid together with freight against masters
statement with supporting documents to follow in due course. Owners
shall nominate agents for the turkish straits passage.

## PROJECTOR VOYAGE CHARTERING TERMS,

DATED 15 APRIL 1999

AMENDED 24 MAY 2004

The following "Projector Voyage Chartering Terms, 15th April 1999"
amended 24th May 2004 will remain in force throughout the duration of

the charter, together with any additional clause(s) or amendment(s)
agreed between Charterer and Owner. Owner guarantees compliance with
all warranties/obligations throughout the duration of this charter.


1.    GENERAL TERMS.

a)    Asbatankvoy Charterparty.

b)    "Worldscale" terms and conditions as at date of Charterparty.

c)    Eighty four (84) Eighty-Four (84) hours laytime allowance
Sundays and holidays included

d)    York/Antwerp Rules 1974, as amended 1990 and 1994

e)    Freight payable in United States Dollars to the Owner's
nominated account by telegraphic transfer.

.)    The negotiation and fixture to remain private and confidential
at all times..

g)    Owner warrants that throughout the duration of this charter,
the vessel will be owned or demise chartered by a member of the
'International Tanker Owner's Pollution Federation Limited' (ITOPF).

h)    Owner warrants that throughout the duration of this charter,
the vessel will be entered in the following Protection and Indemnity
Club (P & I) - ..............


2.    AMENDMENTS TO THE ASBATANKVOY.

..)    Amendment to Part I, Item K

Delete "New York (Strike out one)".


b)    Amendment to Part I, Item L

Delete.


c)    Amendment to Part II, Clause 1

First line, delete "all convenient", insert "utmost".


d)    Amendment to Part II, Clause 5

22

Delete "such cancellation date" insert "vessels arrival at loadport"

Add at end: "Cancellation or failure to cancel shall be without prejudice to any claim for damages Charterer may have against the Owner".

Add at end: "Should Owners become aware that the vessel will miss her cancelling, then Owners to advise Charterers of new required lacan and Charterers to have twenty-four (24) hours to maintain or cancel the Charter Party.

e)    Amendment to Part II, Clause 6

Last sentence, after "However," insert: "irrespective of whether the berth is reachable on arrival or not,"

Last line, add at end: "or demurrage".

Add at end: "In any event Charterer shall be entitled to six hours notice of readiness at loading and discharge ports, even if the vessel is on demurrage".

f)    Amendment to Part II, Clause 7

Add, in each instance, after "used laytime": "or time on demurrage".

g)    Amendment to Part II, Clause 8

Second sentence, after "If, however," insert: "delays occur and/or", and after, "...or consignee of the cargo," insert: "such delays shall count as half laytime, or if on demurrage".

Last sentence, delete "..for any demurrage.."

Add at end: "The Charterer shall not be liable for any delays caused by 'awaiting first tide' and/or waiting daylight and/or awaiting pilot(s) and/or awaiting tug(s)."

h)    Amendment to Part II, Clause 9

Delete, "..reachable on her arrival..".

13

i)    Amendment to Part II, Clause 12

Delete Clause 12 in full and insert:

"Except where freight and/or specified port calls are agreed on a lump
sum basis, dues and other charges upon the vessel, including those
assessed by reference to the quantity of cargo loaded or discharged and
any taxes on freight whatsoever shall be paid by the Owner, and dues and
other charges upon the cargo shall be paid by Charterer. However,
notwithstanding the foregoing, where under a provision of "Worldscale"
and where freight and/or specified port calls are not agreed on a lump
sum basis, a due or charge is expressly stated to be for the account of
Owner or Charterer then such due or charge shall be payable in
accordance with the provision of "Worldscale".

For lumpsum fixtures only, any taxes and/or dues on cargo and/or freight
shall be for Charterers account and settled directly by them.

Where freight and/or specified port calls are agreed to be on a lump sum
basis, such lump sum rate is inclusive of all dues and charges whether
levied upon the vessel, freight, or cargo."

j)    Amendment to Part II, Clause 20 (b) (iii)

Delete '1950', insert "1974 as amended 1990, and 1994".

k)    Amendment to Part II, Clause 24

Delete Clause 24, refer Rider Clause 8.

3.    BILL(S) OF LADING/INDEMNITY CLAUSE.

Discharging port(s) or range(s), shown in Bill(s) of Lading not to
constitute a declaration of discharging port(s) or range(s) and
Charterer to have the right to order the vessel to any port within the
terms of this charter.

Where and when specifically instructed to do so by Charterer, Owner

14

agrees to release the cargo onboard in the following cases:

a)    If no original Bill of Lading is available at discharge port(s) or;

b)    If vessel is ordered to discharge in a port different from the destination as shown in the Bill of Lading.

In consideration of Owner complying with Charterer's specific instructions, as above, Charterer shall, upon giving formal notification to Owner, invoke Owners P & I Club approved wording with no bank guarantee. the following indemnity:

1.    To indemnify Owner(s), Owner(s) servant(s) and agent(s) and to hold Owner(s) and them harmless in respect of any liability loss or damage of whatsoever nature which they may sustain by reason of Owner(s) causing the vessel to proceed to port(s) other than that named in the Bills of Lading and causing the vessel to deliver the cargo at such port(s) without the production of the Bills of Lading. Further, if Charterer requests Owner(s) to deliver the cargo to a person or persons other than the holders of the Bills of Lading to indemnify Owner(s) and hold Owner(s) harmless in respect of any loss or damage of whatsoever nature which Owner(s) may sustain by reason of Owner(s) doing so..

2.    To pay Owner(s) on demand the amount of any loss or damage of whatsoever nature which the Master and/or agent(s) of the vessel and/or y other of Owner(s) servant(s) or agent(s) whatsoever, may incur as a result of the vessel proceeding and delivering the cargo as set out in paragraph 1, hereof.

3.    In the event of any proceedings being commenced against Owner(s) or any of Owner(s), servant(s) or agent(s) in connection with the vessel having proceeded as aforesaid or having delivered the cargo in accordance with Charterer's request, to provide Owner(s) or their servant(s) or agent(s) from time to time on demand with sufficient funds to defend the said proceedings.

4.    If the vessel or any other vessel or property belonging to the Owner(s) should be arrested or detained or if the arrest or detention thereof be threatened, to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the

15

release of such vessel or property and to indemnify Owner(s) in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same may be justified.

5.   If called upon to do so at any time while the goods are in Charterer's possession, custody or control, to redeliver the same to Owner(s).

6.   To produce and deliver up to Owner(s), duly discharged all of the Bills of Lading for the cargoes signed by the Master or on his behalf, as soon as they have arrived and/or come into Charterer's possession.

7.   The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon Owner(s) proceeding first against any person, whether or not such person is party to or liable under this indemnity.

8.   This indemnity shall be construed in accordance with English Law and each and every person liable under this indemnity shall at Owner's request, submit to the jurisdiction of the High Court of Justice of England.

The above indemnity shall automatically be null and void upon presentation of the relevant Bill of Lading, or 13 (Thirteen) months after completion of discharge of cargo to which such indemnity is relevant.

4.   POSITION CLAUSE - SEE MAIN TERMS

Owners warrant that the vessel is open at ............. with an E.T.A at charterers intended load port of ................. weather and safe navigation permitting.  Owners to advise charterers, immediately, of any change in E.T.A of more than 12 hours.

5.   ADDRESS COMMISSION.

Two point five per cent (2.5%) address commission on freight, deadfreight and demurrage, which Charterer's are at liberty to deduct from freight, deadfreight and demurrage payments.

16

6.    WEATHER CLAUSE. - PLS SEE OWNERS ADDITIONAL CLAUSES 11/16

Any time lost at load and/or discharge port(s), whenever/howsoever lost,
which is directly/indirectly attributed to weather conditions and/or
'sea state', shall count as half laytime or if the vessel is on
demurrage, at one half demurrage rate.

7.    THIRD PARTY ARREST CLAUSE.

In the event of arrest or other sanction levied against the vessel or
Charterer arising out of Owner's breach or any fault of Owner, Owner
shall indemnify Charterer for any damages, penalties, costs and
consequences and any time vessel is under arrest due to Owners breach or
any fault of Owner is fully for Owner's account

8.    LAW AND LITIGATION CLAUSE.

This charter shall be construed and the relations between the parties
determined, in accordance with the laws of England.

Any dispute arising out of or in connection with this charter, involving
amounts in excess of US$ 50,000 (United States Dollars Fifty Thousand)
shall be subject to the jurisdiction of the English High Court.

Any dispute arising out of or in connection with this charter involving
amounts up to and including US$ 50,000, (United States Dollars Fifty
Thousand) shall be referred to arbitration by a single arbitrator in
London in accordance with the provisions of the London Maritime
Arbitrators Association (LMAA) Small Claims Procedure.

9.    CLAIMS CLAUSE.

Charterer shall be discharged and released from all liability in respect
of any claims Owner(s) may have under this Charterparty (such as but not
limited to, claims for deadfreight, demurrage, port expenses, shifting
expenses), unless claim has been presented in writing to Charterer with
all available supporting documents within 90 (ninety) days from
completion of discharge of cargo carried under this Charterparty.

10.    OVER-AGE INSURANCE.

17

Over-age insurance on cargo owing to vessel's age shall be for Owner's
account. (If over 15 years).

11. War Risk Additional Expenditure

a)    For the purpose of this clause, a war risk area shall be as
defined from time to time by the Joint War Committee of Lloyd's of
London.

b)    "Additional Premium" means the extra charge imposed by the
vessel's underwriters as a result of the vessel breaching its basic War
Risk Cover by proceeding to a listed area.

c) The additional war risk premium in force at the date of fixture
shall be for Owners' account. Any increase in the additional war risk
premium rate after the date of fixture shall be for Charterers' account.

d)    The first 14 days of additional premium payable shall be for the
Owners' account, and thereafter for Charterers' account, provided that
Owners obtain from their insurers a waiver of any subrogated rights
against Charterers in respect of any claims by Owners under their war
risk insurance arising out of compliance with Charterers orders.

In the event of an extended stay in the vicinity of a listed
area, Charterers may direct the vessel to proceed safely offshore and
thus out of the area which attracts additional premium. The master shall
note and inform Charterers each time the vessel passes into and out of
the listed area.

f)    In assessing liability for additional premium in accordance
with paragraph c) above, the times spent inside the listed area shall be
aggregated, and the aggregated total shall determine the time for which
additional war risk premium is payable.

g)    Charterers shall reimburse Owners for Crew Bonuses, which are
are defined as mandatory payments imposed by the Government or State
under whose flag the Vessel sails, or other Government to whose laws
Owners are subject, or any body or group acting with the power to compel

compliance with their orders or directions. Any voluntary bonus paid by
Owners to the Officers and/or crew in respect of the voyage performed
pursuant to this contract shall be for Owners' account. For the
avoidance of doubt any "blocking and trapping", "loss of profit", "loss
of hire", "loss of freight" or "loss of bunkers" insurance taken out by
Owners in respect of the Vessel, and any additional premium relating
thereto, arising from Charterers trading of the Vessel, shall be for
Owners' account.

h)    Any payments under this clause will be made only against proven
documentation. Any discount or rebate refunded to Owners, for whatever
reason, in respect of additional war risk premium shall be passed on to
Charterers.

See FR8 Additional Clause 9

.2.    ADDITIONAL OIL POLLUTION INSURANCE CLAUSE.
Owner warrants that they have and will maintain throughout the period of
this charter:

(a)    The standard oil pollution insurance cover (currently US$ 1
Billion) available from their P & I Clubs; and

(b)    Any additional oil pollution insurance cover (Currently US$
200 Million) which becomes available via their P & I Club or through
underwriters providing first class security..

(c)    i)    Owner(s) to provide written evidence of (a) and (b)
from their P and I Club and/or underwriters providing first class
security.

    ii)    Such documented evidence to be received by Charterer
.ithin one normal working day of the day the fixture was confirmed.

    iii)    If such documented evidence has not been received by
Charterer before the indicated period then Charterer shall have the
option to either cancel the charter or extend the period under ii) by a
further working day.

13.    CARGO RETENTION CLAUSE.

In the event that any cargo remains on board upon completion of
discharge, Charterer shall have the right to deduct claim from freight
an amount equal to the FOB load port value of such cargo plus an
apportionment of freight, with respect thereto, provided that the volume
of cargo remaining onboard is liquid and pumpable by the vessel's pumps,
or would have been liquid and pumpable but for the fault or negligence
of Owner(s), the Master, the vessel or her Crew (including, but not
limited to incorrect trim and incorrect heating procedures), as
determined by surveyor appointed by Charterer and acceptable to both
Owner and Charterer, whose findings shall be final and binding.

19

Any action or lack of action in accordance with this provision, shall be
without prejudice to any other rights or obligations of the parties.
For the purposes of this clause, any surveyor who is ISO 9002 certified,
shall be considered acceptable to both Owner and Charterer.

14.    DRUG AND ALCOHOL ABUSE CLAUSE.

Owner warrants that it has a policy on drug and alcohol abuse applicable
to the vessel which meets or exceeds the standards in the 'Oil Companies
International Marine Forum guidelines for the control of drug and
alcohol onboard ship, O.C.I.M.F. January 1995'. Owner further warrants
that this policy will remain in effect during the term of this charter
and that Owner shall exercise due diligence to ensure that this policy
is complied with.

15.    INTERNATIONAL SAFETY MANAGEMENT (ISM) CODE.

Owner warrants that a 'Safety Management System (SMS)' in accordance
with the 'ISM Code' will be in operation throughout the duration of this
..aarter. It is a condition of this Charterparty that on and after 1st
July 1998 the Owners or "the Company" (as defined by the ISM Code) shall
have a valid 'Document Of Compliance (DOC)' and the vessel shall have a
valid 'Safety Management Certificate (SMC)'. Upon request the Owner(s)
shall provide a true copy of the relevant DOC and SMC to the Charterer.

Without limitation to Charterer's remedies under this clause, Owner
shall indemnify the Charterer for any losses, damages or expenses
directly/indirectly attributed to vessel's non-compliance with the ISM
code and/or to Owner's failure to respond (or delay in responding) to
Charterer's request for the foregoing certificates and any delays, to
the extent arising from such non-compliance or failure/delay in
responding, shall not count as laytime or, if vessel is on demurrage, as
time on demurrage.

16.    OIL COMPANY APPROVALS CLAUSE.

Owner warrants that the vessel is approved by the following companies
and will remain so throughout the duration of this Charterparty
(Owner'(s) to advise, including inspection dates and expiry dates)

       SEE MAIN TERMS

17.    ELIGIBILITY CLAUSE.

Owner warrants that to the best of their knowledge and belief the vessel
is in all respects eligible and not prevented for any reason whatsoever
for trading to the ports and places specified in Clauses C and D hereof
and that at all necessary time, she shall have onboard all certificates,
records and other documents required for such services. If any element
of this warranty is breached, any delay resulting therefrom shall not
count as laytime, or if the vessel is on demurrage, as time on demurrage
and Owner shall indemnify Charter for any damages or expenses incurred
as a result of such breach.

18.    UNITED STATES OIL POLLUTION ACT OF 1990 (OPA-90).
Owner warrants:

a)    That they and/or the vessel operator has submitted to the
United States Coast Guard for approval a response plan for the vessel
(VRP) which meets in full the requirements of the United States Oil
Pollution Act of 1990, the Government Regulations issued thereunder and
any change, rule or regulation in substitution of, or supplementary to,
such Circular (collectively 'VRP Requirements').

b)    That the VRP is approved and the vessel is operated in
compliance therewith, when and as required by the VRP requirements.

¹)    That the Owner or operator of the vessel and the vessel fully
ₘeets all other requirements of OPA and any Government's Regulations or
guidelines issued thereunder.

This clause does not in any way lessen the overall effect or relieve the
Owner of any State obligations in respect of Vessel Response Plans or
other pollution requirements.

19.    UNITED STATES COAST GUARD (USCG) CLAUSE.

Owner warrants during the term of this charter the vessel will fully
comply, if not in compliance will hold necessary waivers, with all
applicable United States Coast Guard Regulations now in effect,
including, but not limited to, pollution and safety regulations of the
Code of Federal Regulations, as amended, and all other applicable state
pollution and safety laws, rules and regulations as may be promulgated
and subsequent amendment thereto.

The vessel is to have valid certificate(s) onboard complying to the
above regulations at all times during the currency of this Charterparty.

Owner to indemnify Charterer for any penalties, costs or consequences
resulting from vessel's non-compliance and any delays shall not count as
used laytime or time on demurrage if vessel is on demurrage.

20.    U.S. CUSTOMS REGULATION CLAUSE.

21

Owner warrants that, in accordance with U.S. Customs Regulation 19 CFR, section 4.7A and 178.2 as amended, they have the standard carrier Alpha code (SCAC) which will prefix a Bill of Lading serial number and a Form A. The 'Unique Identifier' is to be entered on all Bills of Lading, cargo manifest, cargo declarations and other cargo documents issued under this Charterparty relating to the carriage of goods to the United States. Charterer is not responsible for any losses or delays resulting from Owner's failure to comply with the foregoing.

Owners warrant that they are aware of the requirements of the U.S Bureau of Customs and Border Protection ruling issued on December 5th 2003 under Federal Register Part II Department of Homeland Security 19 CFR Parts 4, 103, et al. and will comply fully with these requirements for entering U.S ports..

21.   ISPS.

.a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, ·xpense or delay, excluding consequential loss, caused by failure on the art of the Owners or the Company to comply with the requirements of the ISPS Code or this Clause shall be for the Owners account.

(b) (i) The Charterers shall provide the CSO and or the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and or the SSO/Master.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers account.

22

22.    VACUUM GASOIL (VGO)/ LOW SULPHUR WAXY RESIDUE (LSWR) CLAUSE.
(IF APPLICABLE)

If loading VGO or LSWR and the previous cargo was fuel oil, marine
diesel oil, VGO or gasoil, it is essential that no tank cleaning is
performed prior to loading except to ensure that all tanks, lines and
pumps are stripped dry and drained of any previous cargo. Furthermore
the R.O.B./O.B.Q. should not exceed 0.1 per cent of cargo quantity and
that these should not contain water.


After all other cargoes, the following tank cleaning must be performed.


1.    Hot machine wash all tanks designated to carry VGO/LSWR (water
pressure 150 psi, temperature 150 deg Fahrenheit).


2.    Strip tanks completely dry and drain all lines and pumps of
water.


3.    a)    Thoroughly wash all tanks, lines and pumps designated
for VGO/LSWR with fresh water to eliminate all traces of salt water.


b)    Drain pumps and lines.


c)    Dry out tanks.


4.    Irrespective of previous cargo, where salt water ballast has
been loaded into cargo tanks designated for VGO/LSWR, the vessel shall:


a)    On completion of de-ballasting strip tanks dry.


b)    Drain pumps and lines.


c)    Fresh water rinse all salt water contaminated tanks,
lines and pumps.

23

d)    Drain pumps and lines.

e)    Dry out tanks.

f)    Where possible, load first into tanks which previously contained ballast to at least 25 pct full before switching to other tanks.

5.    Regardless of previous cargo, prior to loading, all heating coils must be blown through with steam to ensure there is no entrapment f salt water through heating coil leakage.

6.    Heating: Throughout the voyage and discharge, the vessel should maintain loaded temperature or a temperature of plus 15 deg C higher than cargo pour point whichever is higher.

23.    PART CARGO.

The "Worldscale" freight rate for tonnage loaded in excess of minimum agreed quantity will be at 50% (fifty percent) of the agreed "Worldscale" freight rate(s) except where lump sum rates have been agreed.

24.    COMMINGLE CLAUSE.

Charterer to have the right to commingle the cargo in vessel's tanks and Master to execute this operation as per Charterer's instructions subject to ship's safety. If Charterers exercise such option, Owners make no warranty as to cargo quality or evenness of cargo mixture and Charterers will indentify Owners in the event of any claim of this nature arising directly as a result of complying with Charterers instructions under this Clause.

25.    HEATING UP CLAUSE. (IF APPLICABLE)

If required by Charterer's, vessel shall raise cargo temperature but always to a maximum of 135 degrees Fahrenheit. Additional costs associated with increasing cargo temperatures to be reimbursed to Owner

by Charterer at cost, payable against Owner's invoice and supporting documentation.

## 26.    SAMPLING CLAUSE.

Charterer to have the liberty to order the vessel to call at a port for sampling purposes. All port costs to be for the Charterer's account and all time lost to count as used laytime or time on demurrage, if vessel is on demurrage.

## 27.    BLENDING CLAUSE.

Charterer to have the option of discharging part or all cargo in one safe port and reloading same port for further discharge within the agreed ranges. Time at the discharge/reload port to count as laytime or ʿf vessel is on demurrage, as time on demurrage in accordance with charterparty terms and conditions. Freight always to be based on the maximum Bill of Lading quantity carried on any part of the voyage, or the minimum quantity as per Charterparty, which ever is the greater. Reload port to be considered as second loadport for freight calculation purposes.

## 28.    LIGHTERAGE CLAUSE.

If lightering/ship to ship (STS) is required at any designated port, safe place or anchorage, time consumed performing this operation (including back loading) shall count as laytime or time on demurrage in accordance with Charterparty terms and conditions. In either event, time shall commence six (6) hours after anchoring or whenever the lighterage/STS craft is all secure alongside, whichever occurs first.

he anchorage, STS or lighterage area shall not be considered as an additional port or berth and any running time from such lighterage area shall not count as laytime or time on demurrage.

## 29.    PUMPING CLAUSE.

Owner(s) to agree to discharge the entire cargo within 24 hours or maintain 100 P.S.I. (pounds per square inch) at the ships rail provided the shore facilities permit. If shore facilities do not permit discharge within agreed time, then Master to keep pumping logs and issue a letter of protest and to make best endeavours to have both countersigned by the terminal.

Should it become necessary to withdraw the ship from berth because of her proven failure to maintain the discharge rate, all time and expenses

incurred are to be for Owner's account.

## 30.   DIVERSION CLAUSE.

Notwithstanding anything else to the contrary in this Charterparty, and notwithstanding what loading and/or discharging port(s)/range(s) may have been nominated and Bill(s) of Lading issued. The Charterer shall have the right to change its nomination of the loading and/or discharging ports in accordance with Part 1, C and D of the charter. Any extra time and expenses incurred by Owner in complying with Charterer's orders shall be for Charterer's account and calculated in accordance with Part II, Clause 4, of this Charterparty. Charterer shall have the right to make as many changes as it deems necessary.

## 31.   INTERIM PORTS CLAUSE.   (where applicable)   SEE OWNERS ADDITIONAL CLAUSE 12

Charterer shall pay for any interim Load/Discharge port(s) at cost. Time for additional steaming, which exceeds direct route from first Loadport to furthest Discharge Port, shall be paid at the demurrage rate plus bunkers consumed, plus actual port costs, if any. The reasonable, estimated costs will be payable as an on account payment together with freight, followed by final invoice plus all supporting documents as soon as possible but not later than 90 120 days after completion of this voyage.

## 32.   OPERATIONS CLAUSE.

### A)   CLEAN BALLAST.

The vessel is to arrive at the loadport with clean ballast. However, in the event vessel discharges any ballast, notwithstanding the terms and conditions of part II of the Charterparty or "Worldscale", such related time and costs to be for Owner's account.

### B)   CRUDE OIL WASHING. (IF APPLICABLE)

Vessel will routinely employ Crude Oil Washing (COW) on discharge in accordance with the procedures described in the ICS/OCIMF 'Guidelines for Tank Washing with Crude Oil', in the absence of express contrary instructions of the Charterer or prohibition by port or terminal regulations.

Owner(s) agree to comply with applicable port and terminal regulations and, as necessary, to submit any advance information or technical data

26

that may be required by local authorities relative to the conduct of COW operations.

## 33.    AGENTS CLAUSE.

Owner to appoint their (Owner's) ship agent's in accordance with Charterer's suggestion at load and discharge port(s).

Charterers to ensure that their agents are competitive with Owners quote, provided received from a bone fide agent represented in the nominated port.

## 34. OPERATIONAL COMPLIANCE CLAUSE.

Voyage orders to constitute part of this charter..

Owner shall indemnify Charterer for any damages, delays, costs and consequences of not complying with Charterer's voyage instructions given in accordance with the Charterparty.

The vessel is to give ETA notices in accordance with Charterer's voyage instructions and where time permits at least 72/48/24 hours prior to arrival at load and discharge ports. When such ETA notices are not given, any resulting delay at either load or discharge port(s), to be for Owner's account.

The vessel shall not tender Notice of Readiness prior to the earliest layday date specified in this Charterparty and laytime shall not commence before 06:00 hours local time on the earliest layday unless Charter consents in writing.

If a conflict arises between terminal orders and Charterer's voyage instructions, the Master shall stop cargo operations and contact Charterer immediately. The terminal orders shall never supersede Charterer's voyage instructions and any conflict shall be resolved prior to resumption of cargo operations.

## 35.    EARLY LOADING CLAUSE.

27

If Charterer permits vessel to tender NOR and berth prior to
commencement of laydays, all half time from berthing until commencement
of laydays to be credited to Charterer(s) against time used at discharge
port(s).

## 36.   CARGO DOCUMENTS CLAUSE.

Maximum 3 hours for Owner's account for delays solely due to awaiting
delivery of cargo documents, after hoses have been disconnected.

## 37.   EXCESS BERTH OCCUPANCY CLAUSE.

If after the disconnection of hoses, the vessel remains at the berth
exclusively for the vessels' purposes, the Owner will be responsible for
all direct, or indirect, costs charged to Charterer(s) by the terminal,
the supplier(s) or the receiver(s). Alternatively vessel shall vacate
the berth immediately upon the terminals request.

## 38.   WAITING VOYAGE ORDERS CLAUSE.

Charterer to have the liberty of instructing the vessel to wait for
orders at a safe place.  Time to count as used laytime or time on
demurrage, if vessel is on demurrage.

## 39.   SPEED CLAUSE.

The vessel shall perform the laden passage at about 13.5 knots weather
and safe navigation permitting.

Charterer shall have the option to request the vessel to increase her
speed with Charterer reimbursing Owner for the additional bunkers
consumed at replacement cost.

Charterer shall also have the option to request the vessel to reduce her
speed on laden passage.  Additional voyage time shall count against
laytime or time on demurrage, if vessel is on demurrage and the value of
any bunkers saved shall be deducted from any demurrage claim Owner(s)
may have under this Charterparty with the value being calculated at
replacement price.

Owner shall provide documentation to fully support the claims and

28

calculations under this clause.

## 40.   SOUTH EAST ASIA CLAUSES. (IF APPLICABLE)

a)   Chinese River Ports.

If the vessel is required to discharge at non-coastal Chinese
ports/berths, all extra inbound transit time in the river in excess of
normal steaming time, is to count as laytime or time on demurrage, if
vessel is on demurrage. For purposes of calculating extra transit time,
time is to count upon expiry of 6 hours after arrival at first inbound
pilot station, until arrival at customary anchorage for such port/berth.


All extra transit time upto dropping outbound river pilot, in excess of
the normal outbound steaming time in the river, to count as laytime or
time on demurrage, if vessel is on demurrage.


b)   Korean Laytime.

In case the vessel arrives at quarantine station and tenders NOR to load
between 3 hours before sunset and 0100 hours the next day, laytime shall
count from 0700 hours the next day.


c)   Korean Anchor Dues.

South Korean Anchorage dues in excess of seventy two (72) hours to be
or Charterer's account.


End Recap



REGARDS

MAX/NAVIG8 EUROPE


The information contained in this email and any attachments is
confidential and may be subject to copyright or other intellectual
property protection. If you are not the intended recipient, you are not

29

authorized to use or disclose this information, and we request that you notify us by reply mail or telephone and delete the original message from your mail system.

The information contained in this email and any attachments is confidential and may be subject to copyright or other intellectual property protection. If you are not the intended recipient, you are not authorized to use or disclose this information, and we request that you notify us by reply mail or telephone and delete the original message from your mail system.

Best Regards

Ugo Romano

Email: UGO@NAVIG8GROUP.COM <mailto:UGO@NAVIG8GROUP.COM>

Dir: +44 207 467 5892

Mobile: +44 795 11 88 006

Yahoo ID: u_romano

www.navig8group.com <http://www.navig8group.com>

Ex Dls 196/2003, le informazioni contenute in questo messaggio sono strettamente riservate e sono esclusivamente indirizzate al destinatario indicato.
Qualsiasi uso, riproduzione o divulgazione di questo messaggio è vietata.
Nel caso

in cui aveste ricevuto questa mail per errore, vogliate avvertire il
mittente
al più presto a mezzo posta elettronica e distruggere il presente messaggio.
--------------------

This e-mail (including attachments) is intended only for the
recipients(s)named above.
It may contain confidential or privileged information and should not be
read, copied
or otherwise used by any other person(s). If you are not the named
recipient(s), please contact the sender and
delete the e-mail from your system. Ref. Italian L.D. 196/2003.

Claim No: 2008 Folio 21

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:-

RAVENNAVI SpA

Claimant

-and-

PROJECTOR S.A.

Defendant

---

## DEFENCE

---

1.  Abbreviations and headings used in the Particulars of Claim are adopted here for convenience only.

2.  Paragraphs 1 to 3 are admitted, save that the Vessel was called the "Port Russel", and not the "Port Russel|" and it is understood that the Charterparty was cancelled on 13 July 2007.

3.  It is admitted that on or about 13 July 2007 the Claimant entered into the Alternative Fixture for a single voyage from Rotterdam to New York. It is not admitted that the Alternative fixture was entered into by the Claimant in compliance with its duty to mitigate damage as for the reasons set out below the Claimant has not suffered any loss and/or damage.

LDNLIT 1893723.6

4.    Paragraph 5 is denied, for the reasons set out below.

5.    Paragraphs 6 and 7 are noted, although their relevance is denied, for the reasons set out below.

6.    It is submitted that the Claimant suffered no loss and/or damage. As a matter of custom and/or practice, voyages where a vessel is fixed to load to the East and discharge to the West of the Panama Canal attract a premium of between 20-30 World Scale points to reflect the cost of a subsequent ballast voyage to a suitable load port.

7.    The Word Scale equivalent under the Charterparty was 261, which was a fixture to Ecuador only, with no option for the Vessel to go to New York. Had the Vessel had an option to go to New York, it is submitted that the freight rate would have been approximately Word Scale 230. In the event, however, the Alternative Fixture provided for freight to be paid at World Scale 270 and the Claimants have, accordingly, suffered no loss and/or damage. The Defendant will rely on Expert Evidence in support of its case in this regard.

8.    In the alternative, the voyage calculations are wrong on the basis that, as a matter of custom and/or practice, the Claimants must, in circumstances where a vessel is fixed to load to the East and discharge to the West of the Panama Canal, allow in the voyage calculations for an additional ballast leg to the nearest suitable load port.

9.    In this case, the port of discharge under the Charterparty was in Las Salinas, Ecuador and the nearest suitable load port was in Puerto La Cruz, Venezuela, and the Claimant's voyage calculations must be adjusted to allow for the said ballast leg to Puerto La Cruz. The proper calculations in this regard are set out at Schedule A hereto.

10. In the further alternative, the Claimant's calculations of the duration of the hypothetical voyage envisaged by the Charterparty are wrong. The proper calculations in this regard are set out at Schedule B hereto.

11. In the further alternative, the Claimant failed to properly mitigate its losses as it could have fixed the Vessel on an alternative fixture at a more favourable freight rate, in view of the market conditions at the time that the Charterparty was cancelled and the very short period of time between the time that the Charterparty was cancelled and the time that the Alternative Fixture was entered into. As above, the Defendant will rely on Expert Evidence in support of its case in this regard.

12. Paragraph 7 is therefore denied.

13. Paragraph 8 is denied. It is denied that the Claimant is entitled to the relief claimed, or to any relief.

14. Paragraph 9 is admitted.

15. The Claimant's claim at paragraph 10 for entitlement to interest is denied, there being no principal due.

16. The allegations in the Particulars of Claim are denied except in so far as they are admitted or not admitted above.

## STATEMENT OF TRUTH:

The Defendant believes that the facts stated in this Defence are true.
I am duly authorised by the Defendant to sign this Statement of Truth.

Name:     JAMES ADDISON

Signed:     James Allison

Position:     Solicitor

LDN:ITI 1893723.6

Date:        20 March 2008

Served this 20 day of March 2008 by Clyde & Co LLP, 51 Eastcheap, London EC3M

1JP

**Solicitors for the Defendant**

## Schedule A

17. Under the voyage anticipated in the Charterparty, the Vessel would have required 6.14 days to sail from Las Salinas, Ecuador to Puerto La Cruz, Venezuela at a cost of US$ 122,349 on account of bunkers and the cost of traversing the Panama Canal.

18. The duration of the voyage must be increased by 6.14 days from 39.46 days to 45.6 days. US$ 122,349 must be deducted from the voyage surplus of US$ 885,815 equalling US$ 763,466. The time charter equivalent daily earnings would therefore amount to US$ 16,742.68 (US$ 763,466 divided by 45.6).

19. A corresponding allowance must be made in the Alternative Fixture for the Vessel to travel from the port of discharge to a viable load port.

20. It would take 5.90 days for the Vessel to travel to Puerto La Cruz from New York at a cost of US$ 49,054.

21. US$ 49,054 must be deducted from the voyage surplus of US$ 897,463.64 which equals US$ 848,409.64. The duration of the voyage would be increased from 46.6542 days to 52.5542 days and the time charter equivalent daily earnings would therefore amount to US$ 16,143.52 (US$ 848,409.64 divided by 52.5542).

22. The time charter equivalent daily earnings on the hypothetical voyage anticipated under the Charterparty (US$ 16,742.68) must then be deducted from the time charter equivalent daily earnings under the Alternative Fixture (US$ 16,143.52) which equals US$ 599.16 per day.

23. Multiplying this by 45.6 days, being the proper duration of the hypothetical voyage anticipated under the Charterparty, the Claimant's have suffered no more loss than US$ 27,321.696.

24. The Defendant will rely on Expert Evidence in support of its case in this regard.

LDNLIT 1893723.6

## Schedule B

25. The proper calculations of the hypothetical voyage under the Charterparty are as follows:

26. i) From Cotonou (where the Vessel was when it was fixed) to Amsterdam: 12.7 days

   ii) From Amsterdam to the Panama Canal: 15.05 days

   iii) From the Panama Canal to Salinas: 2.11 days

   iv) Allowing for the Panama Canal Transit: 1 day

   v) Laytime: 3.5 days

   Total time: 34.36 days.

27. This reduces the duration of the hypothetical voyage by 5.1 days, reducing the Claimant's claim to US$ 110,346.45.

28. The Defendant will rely on Expert Evidence in support of its case in this regard.

Claim No: 2008 Folio 21

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:-

RAVENNAVI SpA

Claimant

and.

PROJECTOR SA

Defendant

M.T. "PORT RUSSEL"

---

**DEFENCE**

---

Clyde & Co LLP
51 Eastcheap
London EC3M 1JP

Tel:   020 7623 12 44
Fax:   020 7623 5427
Ref:   JAA/BEK/0709560

**Solicitors for the Defendant**

LDNLIT 1893723.6

An application to amend the Claim Form
and Substitute Projector SA for Projector
Services Limited was filed on 15.02.2008

IN THE HIGH COURT OF JUSTICE                    Claim No. 2008 Folio 21
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
BETWEEN:

RAVENNAVI SpA

Claimant

- and -

PROJECTOR SA

Defendant

---

REPLY

(INCORPORATING PARTICULARS OF CLAIM
& DEFENCE)

---

R1.    Unless otherwise stated:

(1) Paragraphs designated "P" followed by the relevant paragraph number are
paragraphs of the Particulars of Claim.

(2) Paragraphs designated "D" followed by the relevant paragraph number are
paragraphs of the Defence.

(3) Paragraphs designated "R" followed by the relevant paragraph number are
paragraphs of the Reply.

(4) The terminology used in the Particulars of Claim is adopted.

1

P1.    By a voyage charterparty on an amended ASBATANKVOY form dated 11th July 2007 ("the Charterparty"), the Claimants, as Disponent Owners, agreed to charter the "PORT RUSSELL" ("the vessel") to the Defendants, as Charterers, for the carriage of a cargo of unleaded gas oil from 1 to 2 safe ports ARA-Hamburg range to 1 to 2 safe ports/ stations Ecuador.

D1.    Abbreviations and headings used in the Particulars of Claim are adopted here for convenience only.

P2.    The Charterparty, to which the Claimant will refer for its full terms and effect, provided (*inter alia*) as follows:

> "... (C) LAYDAYS COMMENCING: 17th JULY 2007 0001 HRS
> CANCELLING: 20th JULY 2007 2359 HRS
>
> (D) LOAD PORT(S)/ RANGE: ½ SP ARA_HAMBURG RGE
> (E) DISCH PORT(S)/ RANGE: 1/2 SP/STS LOCATIONS ECADOR
>
> (F) CARGO DESCRIPTION: CHOPT UP TO FULL CARGO NDFCA PMQS
> GRADE: GASOIL UNLEADED, UNDARKER THAN 2.5 NPA,
> SEGREGATION: MAX 2 GRADES WITHIN VESSEL'S NATURAL SEGREGATION
> ...
>
> (G) FREIGHT RATE(S): USD 1,435,000 BASIS 1:1 IF LOAD ARA
> USD 1,475,000 BASIS 1:1 IF LOAD NTH OF ARA
>
> ABOVE RATES ARE BASIS 1:1 AND VIA PANAMA CANAL ALL INCLUSIVE
>
> ...
>
> LAYTIME: 84 HRS SHINC
> (J) DEMURRAGE: USD 26,000 PDPR
> (K) COMMISSION(S): 2.5 PCNT NAVIG8 EUROPE LTD
> ...

2

*17. PANAMA CANAL TRANSIT CLAUSE*

*Any waiting time for transiting panama canal in laden condition in excess of 24 hours to count as laytime or demurrage if on demurrage, but charterers always to have the benefit of agreed laytime.*

*Prebooking, if required, to be for charterers' account.*

...

*39. SPEED CLAUSE*

*The vessel shall perform the laden passage at about 13.5 knots weather and safe navigation permitting.*

..."

P3.    On or about 12th July 2007 the Defendant, wrongfully and in repudiatory breach of the Charterparty, cancelled the Charterparty.

D2.    Paragraphs P1 to P3 are admitted, save that the Vessel was called the "Port Russel", and not the "Port Russell" and it is understood that the Charterparty was cancelled on 13 July 2007.

R2.    For the avoidance of doubt on 12th July 2007, Max Curtis on behalf of the Claimant e-mailed the Defendant's servants or agents putting them on notice that they would be liable for any loss suffered by the Claimant in the following terms:

> *"As per telecons with yourselves and as per your instructions we confirm that we will endeavour to find and secure other suitable employment for the vessel. Charterers (Projector S.A) are responsible for all losses that may arise due to cancellation of the subject fixture ..."*

P4.    On or about 13th July 2007, in compliance with their obligation to mitigate the damage the Claimant secured an alternative fixture for a single voyage from Rotterdam to New York ("the Alternative Fixture").

D3.    It is admitted that on or about 13 July 2007 the Claimant entered into the Alternative Fixture for a single voyage from Rotterdam to New York. It is not admitted that the Alternative fixture was entered into by the Claimant in compliance with its duty to mitigate damage as for the reasons set out below the Claimant has not suffered any loss

3

and/or damage.

P5.    By reason of the aforesaid the Claimant has suffered loss and damage as particularised below at paragraphs P6 to P8.

D4.    Paragraph P5 is denied, for the reasons set out below.

P6.    The time charter equivalent of the Alternative Fixture was US$ 19, 236.52 per day and the voyage lasted 46.6542 days as set out in detail in the attached schedule at HFW 1.

P7.    The time charter equivalent of the cancelled Charterparty was US$ 22,448 per day with a voyage estimate of 39.46 days.

D5.    Paragraphs P6 and P7 are noted, although their relevance is denied, for the reasons set out below.

R3.    As to paragraphs D3 to D5, it is denied that the Claimant has not suffered any loss and/or damage for the reasons set out below.

D6.    It is submitted that the Claimant suffered no loss and/or damage. As a matter of custom and/or practice, voyages where a vessel is fixed to load to the East and discharge to the West of the Panama Canal attract a premium of between 20-30 World Scale points to reflect the cost of a subsequent ballast voyage to a suitable load port.

R4.    As to paragraph D6:

        (1) It is admitted that in general an owner of a vessel seeks a premium to go to the West Coast of America.

        (2) It is not admitted that the premium is necessarily 20 to 30 World Scale Points. The premium can vary widely depending on market pressure.

        (3) It is denied that the Claimant suffered no loss and/or damage.

4

R5.  The Claimant had agreed to deliver the vessel to the Head Owners, Port Russel GMBH & Co, at Ecuador after completion of discharge in Ecuador. The Claimant would not have made a ballast voyage from Ecuador to the Caribbean. In the premises, in assessing the Claimant's loss and damage it is wrong to consider a ballast allowance. The Claimant will rely on Expert Evidence in this regard.

D7.  The Word Scale equivalent under the Charterparty was 261, which was a fixture to Ecuador only, with no option for the Vessel to go to New York. Had the Vessel had an option to go to New York, it is submitted that the freight rate would have been approximately Word Scale 230. In the event, however, the Alternative Fixture provided for freight to be paid at World Scale 270 and the Claimants have, accordingly, suffered no loss and/or damage. The Defendant will rely on Expert Evidence in support of its case in this regard.

R6.  As to paragraph D7:

(1) It is not admitted that the World Scale equivalent under the Charterparty was 261.

(2) It is denied, if it is so alleged, that the "equivalent" under the Charterparty should include a ballast voyage back to the Caribbean for the reasons set out at paragraph R5 above.

(3) It is denied that had the vessel had an option to go to New York the freight rate would have been approximately World Scale 230 for the following reasons:

(a) On 12th July 2007 when the vessel was fixed to the Defendant the rate for Baltic clean tanker route TC2 Rotterdam New York was World Scale 241.04.

(b) On 14th July 2007 the rate for Baltic clean tanker route TC2 Rotterdam New York as World Scale 245.63.

5

(c) The rates given by the Baltic Panellists are basis of a minimum cargo size 37,000 mt.

(d) The minimum cargo size pursuant to the Alternative Fixture was 32,250 mt.

(e) It is customary if fixing a smaller cargo size to pro rata the World Scale rate accordingly.

(f) In the premises the World Scale rate for minimum 32,250 mt on 12th July 2007 would be approximately 276.54 and on 14th July 2007 would have been 281.

(g) The Claimant will rely on Expert Evidence in this regard.

(4) It is admitted that the Alternative Fixture provided for freight to be paid at World Scale 270.

(5) It is denied that the Claimant has not suffered loss and/or damage.

D8.    In the alternative, the voyage calculations are wrong on the basis that, as a matter of custom and/or practice, the Claimants must, in circumstances where a vessel is fixed to load to the East and discharge to the West of the Panama Canal, allow in the voyage calculations for an additional ballast leg to the nearest suitable load port.

R7.    Paragraph D8 is denied for the reasons set out in paragraph R5 above.

D9.    In this case, the port of discharge under the Charterparty was in Las Salinas, Ecuador and the nearest suitable load port was in Puerto La Cruz, Venezuela, and the Claimant's voyage calculations must be adjusted to allow for the said ballast leg to Puerto La Cruz. The proper calculations in this regard are set out at Schedule A hereto.

R8.    Paragraph D9 is denied. For the reasons set out in paragraph R5 it is denied that the Claimant's voyage calculations must be adjusted to allow for a ballast leg to Puerto La

6

Cruz. It is denied that the proper calculations are set out at Schedule A for the reasons set out below.

D10. In the further alternative, the Claimant's calculations of the duration of the hypothetical voyage envisaged by the Charterparty are wrong. The proper calculations in this regard are set out at Schedule B hereto.

R9. Paragraph D10 is denied. It is denied that the proper calculations are set out at Schedule B for the reasons set out below.

D11. In the further alternative, the Claimant failed to properly mitigate its losses as it could have fixed the Vessel on an alternative fixture at a more favourable freight rate, in view of the market conditions at the time that the Charterparty was cancelled and the very short period of time between the time that the Charterparty was cancelled and the time that the Alternative Fixture was entered into. As above, the Defendant will rely on Expert Evidence in support of its case in this regard.

R10. Paragraph D11 is denied. It is denied that the Claimant failed to mitigate its loss for the following reasons:

(1) The vessel was out in ballast from Cotonou having sailed on 1st July 2007.

(2) The vessel sailed from Contonou and loaded bunkers. The cancelling date for Trafigura under the Alternative Fixture was 17th July 2007. In the premises the vessel was due in Rotterdam on or about 16th/17th July 2007.

(3) Although the market was rising slightly, increased waiting time causes a greater loss to a vessel owners' earnings and thus an owner needs to fix a replacement cargo as a matter of priority.

(4) Had the Claimant waited they would have missed fixing in respect of suitable early stems.

7

(5) If the Claimant had waited to re-fix the vessel for too long they would have been unable to deliver the vessel to the Head Owners in time for the Head Owners to meet their dry docking commitments.

(6) In the premises the Claimant complied with its duty to mitigate its loss by entering into the Alternative Fixture.

D12.   Paragraph P7 is therefore denied.

P8.    In the premises the Claimant's have suffered loss and damage in the sum of US$3,211.48 per day for the 39.46 days the voyage under the cancelled Charterparty would have lasted, namely US$ 126,725.

D13.   Paragraph P8 is denied. It is denied that the Claimant is entitled to the relief claimed, or to any relief.

P9.    On 22nd August 2007 the Claimant presented their claim for US$ 126,725 to the Defendant.

D14.   Paragraph P9 is admitted.

P10.   Further the Claimant claims and is entitled to interest pursuant to section 35A of the Supreme Court Act 1981 on the damages found to be due at such rate and for such period as the Court shall think fit.

D15.   The Claimant's claim at paragraph P10 for entitlement to interest is denied, there being no principal due.

D16.   The allegations in the Particulars of Claim are denied except in so far as they are admitted or not admitted above.

## Schedule A

D17.   Under the voyage anticipated in the Charterparty, the Vessel would have required 6.14

8

days to sail from Las Salinas, Ecuador to Puerto La Cruz, Venezuela at a cost of US$ 122,349 on account of bunkers and the cost of traversing the Panama Canal.

R11.  The relevance of paragraph D17 is denied. For the reasons set out at paragraph R5 above it is denied that the vessel would have completed a ballast voyage to Puerto La Cruz and such a ballast voyage should not be included in any calculations.

D18.  The duration of the voyage must be increased by 6.14 days from 39.46 days to 45.6 days. US$ 122,349 must be deducted from the voyage surplus of US$ 885,815 equalling US$ 763,466. The time charter equivalent daily earnings would therefore amount to US$ 16,742.68 (US$ 763,466 divided by 45.6).

R12.  The relevance of paragraph D18 is denied. It is denied that the duration of the voyage must be increased by 6.14 days, or at all, to take into account a ballast voyage from Ecuador to Puerto La Cruz for the reasons set out above at paragraph R5.

D19.  A corresponding allowance must be made in the Alternative Fixture for the Vessel to travel from the port of discharge to a viable load port.

R13.  Paragraph D19 is denied. It is denied that a corresponding allowance must be made in the Alternative Fixture for the vessel. Following the Alternative Fixture the Claimant delivered the vessel to the Head Owners in New York following Trafigura's voyage to New York.

D20.  It would take 5.90 days for the Vessel to travel to Puerto La Cruz from New York at a cost of US$ 49,054.

R14.  The relevance of D20 is denied for the reasons set out at paragraph R13 above.

D21.  US$ 49,054 must be deducted from the voyage surplus of US$ 897,463.64 which equals US$ 848,409.64. The duration of the voyage would be increased from 46.6542 days to 52.5542 days and the time charter equivalent daily earnings would therefore amount to US$ 16,143.52 (US$ 848,409.64 divided by 52.5542).

9

R15. The relevance of paragraph D21 is denied. It is denied that the cost of a voyage from New York to Puerto La Cruz must be deducted from a voyage surplus for the reasons set out above at paragraph R13.

D22. The time charter equivalent daily earnings on the hypothetical voyage anticipated under the Charterparty (US$ 16,742.68) must then be deducted from the time charter equivalent daily earnings under the Alternative Fixture (US$ 16,143.52) which equals US$ 599.16 per day.

D23. Multiplying this by 45.6 days, being the proper duration of the hypothetical voyage anticipated under the Charterparty, the Claimant's have suffered no more loss than US$ 27,321.696.

R16. Paragraphs D22 & D23 are denied for the reasons set out above. No ballast voyage from Ecuador to Puerto La Cruz or from New York to Puerto La Cruz should be included in the calculations for the reasons set out above (and in particular at paragraph R5 and R13).

D24. The Defendant will rely on Expert Evidence in support of its case in this regard.

R17. Paragraph D24 is noted. The Claimant will rely on Expert Evidence in support of its case.

#### Schedule B

D25. The proper calculations of the hypothetical voyage under the Charterparty are as follows:

D26. i)    From Cotonou (where the Vessel was when it was fixed) to Amsterdam: 12.7 days

ii)    From Amsterdam to the Panama Canal: 15.05 days

10

    iii)    From the Panama Canal to Salinas: 2.11 days

    iv)    Allowing for the Panama Canal Transit: 1 day

    v)    Laytime: 3.5 days

Total time: 34.36 days.

R18.  Paragraph D26 (i) is admitted.

R19.  As to paragraphs D26 (ii) to (v) the Claimants' calculation of the hypothetical voyage is as follows:

    (1) From Amsterdam to Balboa: 15.01 days

    (2) From Balboa to Salinas: 2.1 days

    (3) Allowing for the Panama Canal Transit: 1 day

    (4) Laytime 3.5 days

Total time: 34.4 days.

D27.  This reduces the duration of the hypothetical voyage by 5.1 days, reducing the Claimant's claim to US$ 110,346.45.

R20.  Paragraph D27 is denied. If the voyage time is reduced then the Claimant's claim for loss and/or damage increases as follows:

    (1) The net profit was US$ 915,541.10 (for a voyage from Amsterdam to Salinas, as per the calculation attached at HFW 2) which divided by 39.46 days produces a time charter equivalent rate of US$ 23,201.75 per day.

    (2) If the net profit of US$ 915,541.10 is divided by 34.4 days, the time charter equivalent rate is US$26,614.57.

    (3) Thus if the voyage time is reduced by 5.1 days the Claimant's claim would be

as follows:

(US$26,614.57 – 19,236.52) x 34.36 days = US$250,771.84.

R21. In the premises the Claimant avers that the true measure of its loss and damage is US$250,771.84 and hereby claims payment of the same.

D28. The Defendant will rely on Expert Evidence in support of its case in this regard.

R22. Paragraph D28 is noted. The Claimant will rely on Expert Evidence in support of its case.

AND the Claimant claims:

US$ 126,725, alternatively damages.
Interest.
Costs.

RUTH HOSKING

Statement of Truth

The claimant believes that the facts in these Particulars of Claim are true. I am duly authorised by the Claimant to sign these statements.

| Full Name: | MARIA BORG BARTHET |
| Name of Claimant's solicitors: | HOLMAN FENWICK & WILLAN |
| Signed: | Position or office held: Assistant Solicitor |

Served this 25 February 2008 by Holman Fenwick & Willan, Marlow House, Lloyds Avenue, London, EC3N 3AL, Solicitors for the Claimants. (Ref. JJC/451/MBB-5537/4)

Attached: Charterparty between Ravennavi SpA and Projector SA dated 11 July 2007.

12

RUTH HOSKING

Statement of Truth

The claimant believes that the facts in this Reply are true. I am duly authorised by the Claimant to sign these statements.

Full Name:                          MARIA BORG BARTHET
Name of Claimant's solicitors:       HOLMAN FENWICK & WILLAN
Signed:                             Position or office held: Assistant Solicitor

Served this 3 April 2008 by Holman Fenwick & Willan, Marlow House, Lloyds Avenue, London, EC3N 3AL, Solicitors for the Claimants. (Ref. JJC/451/MBB-5537/4)

13

# VESSEL
## PORT RUSSEI

| VOYAGE NO / TIMECHARTER NO: | | | | | TYPE OF CONTRACT | ASBATANKVOY |
| CHRTR / OP: | PROJECTOR/CP DATED 11.07.2007 | MIN QUANTITY MT: | UP TO FULL ... 1GO | | ADDR COMM% | |
| LOAD MONTH: | AMSTERDAM | FREIGHT RATE (USD): | USD 1.475,00 | QUESTIONNAIRE | |
| DISPORTS: | SALINAS | DEMURRAGE: | USD 26.000,00 | WAITING DOCS | |
| CARGO GRADES: | GASOIL | | | BROKERS | NAVIG8 |
| QUANTITY LOADED / BL DATE: | FULL CARGO | | | | |

### TIME TABLE

| | ONHIRE | OFFHIRE | Duration | OFF HIRE PERIOD | | Preliminary | Final |
| | | | VOY | | | (U.S.D.) | (U.S.D.) |
| from | 01/00 0:00 | 01/00 0:00 0.M.T. | 1° Period / Days | | | | |
| to | 01/00 0:00 | 01/00 0:00 0.M.T. | 2° Period / Days | | | | |
| | 34,4000 | 0.00000 | 3° Period / Days | | | 1.435.000,00 | |
| days | | | 34,4000 | | | | |

### VOY TABLE

| | | | | Preliminary (U.S.D.) | Final (U.S.D.) |
| INCOME | | | | | |
| FREIGHT LUMPSUM | | | | | 1.435.000,00 |
| | | | | | |
| TOTAL | | | | | 1.435.000,00 |
| EXPENSES | | | | | |
| PORT EXPENSES LOADPORT AMSTERDAM | | | | | 60.000,00 |
| PORT EXPENSES DISPORT BALBOA | | | | | 30.000,00 |
| TOTAL | | | | | 81.000,00 |
| CANAL TRANSIT PANAMA | | | | | 230.216,40 |
| COST OF BUNKER CONSUMED PORT | | | | | 4.451,00 |
| COST OF BUNKER CONSUMED AT SEA | | | | | 53.912,59 |
| BROKERS COMMISSION 3,75% | | 3,75% | | | |
| TOTAL | | | | | 916.541,10 |
| TOTAL NET INCOME | | | | | |
| VOY DAYS | | | | | 34,4000 |
| DAILY PROFIT | | | | | |

### COMMENTS

notes: PRICE OF BUNKER USED AS PER LAST INVOICE I.E. $ 362 F.O. AND $ 833 GASOIL

FM COTONOU TO AMSTERDAM = 12,7 DAYS
FM AMSTERDAM TO BALBOA = 15,01 DAY +1 DAY PANAMA TRANSIT = 16,1 DAY
FM BALBOA TO SALINAS = 2,1 DAYS
LAYTIME 3,5 DAYS
TOTAL DAYS = 34,4

BALLAST SPEED 13,5 MT 23 FO   LOADSPEED 13,5 MT 28,5 FO
LOAD MT 4,8 FO DISCH. MT 11,50 FO AND 7 GASOIL   IDLE MT 3,1 FO

### FUELS TABLE

| | Q.TY Supplied | R.O.B. | COST | UNIT COST | TOTAL COST |
| FUEL OIL | mt | mt | mt | usd/mt | usd |
| COTONOU AMSTERDAM | 282.100 | 282.100 | | 362,000 | |
| AMSTERDAM BALBOA | 433.450 | 433.450 | | 362,000 | |
| BUNKER CONS PORTS LOAD | 16.300 | 16.300 | | 362,000 | |
| BALBOA SALINAS | 59.650 | 59.650 | | 362,000 | |
| TOTAL BUNKER SUPPLIED | 801.700 | 801.700 | | | |
| TOT COST BUNKER CONSUMED | 801.700 | | | | |
| | | | | | |
| GASOIL | mt | mt | mt | usd/mt | usd |
| BUNKER CONS AT DISPORT | 7.000 | 7.000 | | 833,000 | |
| TOTAL BUNKER SUPPLIED | 7.000 | | | | |
| TOT COST BUNKER CONSUMED | 7.000 | | | 833,000 | |

An application to amend the Claim Form
and Substitute Projector SA for Projector
Services Limited was filed on 15.02.2008

**IN THE HIGH COURT OF JUSTICE**                    **Claim No. 2008 Folio 21**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**BETWEEN:**

### RAVENNAVI SpA

**Claimant**

- and -

### PROJECTOR SA

**Defendant**

---

### LIST OF ISSUES

---

This List identifies in broad terms the principal issues in the case. It does not prescribe the correct legal test for any issue and does not restrict submissions on the law. The order of issues does not convey the relative importance of the issues or bind the Court as to the manner in which evidence is to be adduced in relation thereto or indicate the order in which the issues are to be considered and/or determined at trial.

#### A. Claims in Contract

**Loss and Damage**

1. Did the Claimants suffer loss and/or damage by reason of the Defendant's repudiatory breach of the Charterparty? In particular:

   (1) What is the correct time charter equivalent rate for the Charterparty?

   (2) What is the correct voyage estimate of the voyage under the Charterparty?

   (3) What is the correct time charter equivalent rate for the Alternative Fixture?

   (4) Should the calculations include a ballast voyage from Ecuador to Puerto La Cruz?

   (5) Should the calculations include a ballast voyage from New York to Puerto La Cruz?

(6) What, if anything, can be determined about the Claimant's loss and/or damage using the World Scale Rates?

### Mitigation

2. Did the Claimants comply with their duty to mitigate their loss? In particular:

   (1) Did the Claimant's reasonably mitigate their loss by re-fixing the vessel to Trafigura on or about 13th July 2007?

   (2) Should the Claimants have refixed the vessel on an alternative fixture at a more favourable freight rate? If so,

   (a) At what rate?
   (b) For what duration?

### B. Expert Evidence

3. Expert evidence from a charterparty broker as to:

   (1) The principle and practice of calculating time charter equivalent rates;
   (2) Calculations of the relevant time charter equivalent rates;
   (3) An assessment of the Claimant's loss and/or damage (if any); and
   (4) An assessment of the Alternative Fixture, in particular whether the Claimant should have concluded a different fixture and if so on what terms.

   will be relevant to determination of issues 1 & 2.

### C. Common Ground

There is common ground between the parties on the following issues:

1. The parties entered into a voyage charterparty on an amended ASBTANKVOY form dated 11th July 2007 pursuant to which the Claimants, as Disponent Owners, agreed to charter the "PORT RUSSELL" to the Defendants for the carriage of a cargo of unleaded gas oil from 1 to 2 safe ports ARA-Hamburg range to 1 to 2 safe ports/ stations Ecuador.

2. On or about 12th July 2007 the Defendant, wrongfully and in repudiatory breach of the Charterparty, cancelled the Charterparty.

3. On or about 13th July 2007 the Claimants entered into an alternative fixture for a single voyage from Rotterdam to New York.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

RAVENNAVI SpA,                                              :
                                                           :        08 CV _____
                              Plaintiff,                   :
                                                           :        ECF CASE
         - against -                                       :
                                                           :
PROJECTOR S.A.,                                            :
                                                           :
                              Defendant.                   :
------------------------------------------------------------------X

### AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut    )
                        )        ss:  Town of Southport
County of Fairfield     )

         Kevin J. Lennon, being duly sworn, deposes and says:

         1.      I am a member of the Bar of this Court and represent the Plaintiff herein. I am

familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

### DEFENDANT IS NOT PRESENT IN THE DISTRICT

         2.      I have attempted to locate the Defendant, PROJECTOR S.A. within this District.

As part of my investigation to locate the Defendant within this District, I checked the telephone

company information directory, as well as the white and yellow pages for New York listed on

the Internet or World Wide Web, and did not find any listing for the Defendant. Finally, I

checked the New York State Department of Corporations' online database which showed no

listings or registration for the Defendant.

3.    I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.    Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

5.    This is Plaintiff's first request for this relief made to any Court.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

6.    Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson (Siegel), Colleen McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendants.

7.    Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

2

8.     To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9.     Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10.    Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

Dated:     July 1, 2008
           Southport, CT

                                              _____
                                              Kevin J. Lennon

3

Sworn and subscribed to before me
this 1st day of July 2008.

NOTARY PUBLIC

4